1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          EASTERN DISTRICT OF CALIFORNIA
10

11   ERNEST COTTERMAN, an individual,      No.  2:19-cv-01235-MCE-CKD
12              Plaintiff,
13        v.                               **MEMORANDUM AND ORDER**
14   JAN X-RAY SERVICES, INC., a
     Michigan corporation,
15
16              Defendant.
17

18        On May 17, 2019, Plaintiff Ernest Cotterman ("Plaintiff") initiated this lawsuit in the

19   Superior Court of California, County of Sacramento, against his former employer Jan

20   X-Ray Services, Inc. ("Defendant") for alleged discrimination, retaliation, failure to

21   prevent discrimination and retaliation, failure to provide reasonable accommodations,

22   failure to engage in a good faith interactive process, declaratory judgment, denial of and

23   discrimination based upon the use of sick leave, and wrongful termination.  Ex. A, Not.

24   Removal, ECF No. 1-2 ("Compl.").  Defendant subsequently removed the case to this

25   Court on diversity grounds pursuant to 28 U.S.C. § 1332.  Not. Removal, ECF No. 1.

26   Presently before the Court is Defendant's Motion for Summary Judgment or, in the

27   alternative, Partial Summary Judgment.  ECF No. 17 ("Def.'s Mot.").  This matter has

28   ///

                                        1

been fully briefed.  ECF Nos. 19 ("Pl.'s Opp'n"), 21 ("Def.'s Reply").  For the reasons set forth below, Defendant's motion is GRANTED in part and DENIED in part.[1]

**BACKGROUND**[2]

### A.    Plaintiff's Employment and Job Position with Defendant

Plaintiff is a former union employee of Defendant, who is a leading provider of non-destructive testing solutions in the United States and specializes in pipeline and facility new construction inspections.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶¶ 1, 3.  Defendant utilizes a variable union workforce, meaning that union employees are not engaged full-time, but rather are assigned project-by-project, and when not actively working for Defendant, may be working for other companies.  Id. ¶ 2.  Plaintiff belonged to the International Union of Operating Engineers, Local 112, and consistent with Defendant's use of its variable union workforce, had multiple short-term stints performing assignments for Defendant.  Id. ¶ 3.

Plaintiff worked as a Level I Technician.  Id. ¶ 4.  According to his job description:

> The main function of the Level I Technician is to provide field support for the Level II Technician and perform basic NDT [nondestructive testing] services under direct guidance of the Level II Technician.  This will include using, supplying, and/or holding materials or tools; transporting equipment and cleaning work area and equipment; learning different NDT methods and techniques; following established methods of NDT inspection and procedures to determine compliance under direct supervision; and learning field operational practices to compliment Level I certification.  The Level I Technician position is typically the mid-level position for [Defendant's] employees and is a union position.

Ex. D, ECF No. 17-6, at 47 (Level I Technician job description).  Level I Technicians work in tandem with Level II Technicians and are often referred to as "helpers," meaning

---

[1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

[2] Unless otherwise stated, the facts are assembled from Plaintiff's Response to Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment (ECF No. 19-4).

1  that their job is to help the Level II Technicians who are responsible for taking and

2  reading x-rays of welds in steel pipes to make sure there are no flaws in the weld.  Pl.'s

3  Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶¶ 6–7.

4  A function of the Level I Technician is to carry, set up, and move the 55-pound

5  camera used by the Level II Technician to take x-rays.[3]  Ex. D, ECF No. 17-6, at 49

6  (Level I Technician job description).  After the x-rays are taken, the Level II Technician

7  develops the x-rays and then analyzes them to evaluate the structural integrity of the

8  welds.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 41.  While

9  the Level II Technician develops and analyzes the x-rays and completes the necessary

10  certification paperwork, the Level I Technician will move the camera and set it up for the

11  next x-ray.  Id. ¶ 42.  Additionally, a Level I Technician must be able to climb, crawl,

12  crouch, lift, pull, push, reach, and make repetitive motions.  Ex. D, ECF No. 17-6, at 49–

13  50 (Level I Technician job description).

14  **B.  Defendant's Policies**

15  Defendant maintains an Accident Response & Reporting Policy (the "Reporting

16  Policy"), which provides the following:

17  2.0 SCOPE AND RESPONSIBILITIES:

18  1.  <u>Employees</u>:  All employees shall report all safety
incidents to their immediate supervisor for investigation.  This
19  reporting is to be IMMEDIATELY (at least within 1 hour)
AFTER THE INCIDENT/INJURY.  Employees will be expected
20  to participate in the incident investigations as required.  Site
Supervisors are responsible for reporting incidents on larger
21  work sites.

22  2.  <u>Supervisors</u>:  All supervisors are to <u>immediately</u> make
an initial report to the Company Safety Officer.  Also, [a]ll
23  supervisors shall promptly (WITHIN 24 HOURS) investigate all
safety incidents and submit appropriate reports to the
24

25

26  [3] The parties dispute the significance of this responsibility.  Defendant states that this is the
primary and essential function of the Level I Technician position.  Pl.'s Response Def.'s Statement of
27  Undisputed Facts, ECF No. 19-4 ¶ 8 (citing Ex. I, Hammond Dep., ECF No. 17-6, at 134–36).  On the
other hand, Plaintiff agrees that carrying the camera was one of his job responsibilities but disputes that
28  this was his primary responsibility.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4
¶ 8 (citing Cotterman Decl., ECF No. 19-1 ¶¶ 5–6).

JANX/Applus RTD[4] Company Safety Officer for review.  They shall determine causes and take immediate action to correct any unsafe acts or conditions within their control.

3.  <u>Management</u>:  Initially the [Environmental,] Health & Safety [("EHS")][5] Director will advise and assist the employee's immediate supervisor on actions to be taken.  The Local JANX/Applus RTD Company Safety Officer (Local EHS Manager) shall promptly review all safety incident reports and develop the corrective action to prevent similar incidents.  The Corporate EHS Manager – USA will assist JANX/Applus RTD – USA in maintaining the required OSHA Logs and communication with the insurance companies.  All results shall be communicated to workers, by crew briefings or posting.  Incident records will be retained by JANX/Applus RTD for at least five years three years [sic], beyond the current year of the incident date.

. . .

5.0 LATE AND/OR FALSE REPORTING

Any employee, who delays or falsifies reporting, will be subject to discipline, up to the possibility of termination.

Ex. G, ECF No. 17-6, at 120–22; Ex. 4, ECF No. 19-6, at 86–88 (same).  According to Defendant, the Reporting Policy requires employees to report all safety incidents to their immediate supervisor within one hour of the occurrence and then submit an Incident-Accident-Injury Report form to the EHS Manager within 24 hours.  Def.'s Mot. at 7. Plaintiff interpreted the Reporting Policy to mean that he was permitted to report his injury to his immediate supervisor, which he believed to be his Level II Technician, and that it was the supervisor's responsibility to submit an incident report to the EHS Manager.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶¶ 12– 14.

Defendant also has a policy regarding reasonable accommodations (the "RA Policy"):

///

---

[4] Applus RTD USA, Inc. is the parent company of Defendant.  <u>See</u> Gross Decl., ECF No. 17-3 ¶ 1.

[5] The parties' briefs and supporting documentation interchangeably refer to EHS Manager or Supervisor as the "Health, Safety, & Environmental" ("HSE") Manager or Supervisor.  The Court assumes that both EHS and HSE designations refer to the same position.

[Defendant] is committed to principles of equal opportunity for all job applicants and employees. In keeping with this policy, [Defendant] does not engage in impermissible discrimination based on any protected characteristic, including but not limited to an individual's disability or religion.  [Defendant] will also make reasonable accommodations that are necessary to comply with the state and federal disability and religious discrimination laws.  This means that [Defendant] will make reasonable accommodations for the known physical or mental disability, known medical condition, or religious practice or dress of an applicant or employee, consistent with its legal obligation to do so.

As part of its commitment to make reasonable accommodations, [Defendant] also wishes to participate in a timely, good faith, interactive process with the applicant or employee to determine effective reasonable accommodations, if any, that can be made in response to a request for accommodations.  Applicants and employees are invited to identify reasonable accommodations that can be made to assist them to perform the essential functions of the position they seek or occupy.  They should contact Management or Human Resources as soon as possible to request the opportunity to participate in a timely interactive process.  By working together in good faith, [Defendant] hopes to implement any reasonable accommodations that are appropriate and consistent with its legal obligations.

Ex. F, ECF No. 17-6, at 61–62 (union employees handbook).

### C.   Plaintiff's Injury and Medical Treatment

Plaintiff's most recent assignment with Defendant took place between May 8 and June 3, 2017, in Sacramento, California.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶¶ 5, 10.  On May 18, 2017, Plaintiff suffered an injury to his right shoulder while lifting the 55-pound camera.  Id. ¶ 11; Cotterman Decl., ECF No. 19-1 ¶ 10.  After sustaining the injury, Plaintiff informed his Level II Technician Dustin Jones ("Jones"), who Plaintiff considered to be his immediate supervisor.  Id. ¶ 11.  However, Plaintiff did not report his injury to his manager, Wes Summers ("Summers"), or complete an Incident-Accident-Injury report within the required time frames.  Def.'s Mot. at 7–8 (citing Ex. G, ECF No. 17-6); see Ex. A, Cotterman Dep., ECF No. 17-6, at 12. Initially, Plaintiff did not think his injury was severe enough to seek immediate medical care and thus it did not merit a report higher than Jones.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 14.  However, over the next ten days,

1   Plaintiff told Jones several times that he was in pain, but Jones minimized the issue and

2   told Plaintiff to walk it off.  Cotterman Decl., ECF No. 19-1 ¶¶ 12–13.  Jones also told

3   Plaintiff that he should wait several days before seeking treatment so Jones could

4   accompany him to the doctor.  Id. ¶ 14.

5          On May 28, 2017, Plaintiff went to the hospital for treatment and the physician's

6   assistant who examined Plaintiff prepared a Doctor's First Report of Occupational Injury

7   or Illness ("Doctor's First Report"), in which Plaintiff stated he "pulled a muscle in [his]

8   right shoulder while doing [his] normal task at work," specifically lifting the camera and

9   cranking the motion.  Ex. 6, ECF No. 19-6, at 154.  Plaintiff was diagnosed with right

10  shoulder pain and prescribed pain medication, but the physician's assistant wrote that

11  Plaintiff is able to perform usual work as long as he could tolerate the pain and that

12  Plaintiff needs to follow-up with his primary care provider.  Id.  After his hospital visit,

13  Plaintiff returned to work, told Jones about his treatment at the hospital, and gave Jones

14  the Doctor's First Report to fax it to the upper management.  Pl.'s Opp'n at 7; see Ex. A,

15  Cotterman Dep., ECF No. 17-6, at 12 (stating that Plaintiff did not inform Summers that

16  he was seeking medical treatment).  According to Plaintiff, Jones was very upset that

17  Plaintiff sought medical care without permission and told Plaintiff that he would be

18  "blackballed" by Defendant, meaning Plaintiff would be prevented from working in the

19  field for Defendant.  Cotterman Decl., ECF No. 19-1 ¶ 18.

20         The following day, Plaintiff told a fellow employee that he injured himself using the

21  camera crank, and that employee relayed this conversation to Summers.  Ex. J, ECF

22  No. 17-6, at 144 (Summers's investigative notes).  On May 30, 2017, Summers spoke to

23  Defendant's EHS Manager Steve Hammond ("Hammond") about Plaintiff's injury.  Pl.'s

24  Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 18.  Later that same

25  day, Summers called Plaintiff, who then informed Summers of his injury and subsequent

26  medical treatment.  Id. ¶ 19.  When Summers asked why Plaintiff did not report his injury

27  to him, Plaintiff responded that he told Jones.  Ex. J, ECF No. 17-6, at 144 (Summers's

28  investigative notes).  Summers reminded Plaintiff that the Reporting Policy requires

6

1  employees to report any incidents within 24 hours to Summers or to the EHS

2  department.  Id.  Plaintiff acknowledged the reporting requirement but asserts that he did

3  not violate the Reporting Policy because his understanding was that he was permitted to

4  report his injury to Jones, his immediate supervisor, and that it was Jones's responsibility

5  to submit an incident report to the EHS Manager.  Pl.'s Response Def.'s Statement of

6  Undisputed Facts, ECF No. 19-4 ¶¶ 12–14.

7        **D.    Meeting Between Plaintiff, Summers, and Hammond on June 2, 2017**

8        On June 2, 2017, Summers and Hammond met with Plaintiff to discuss Plaintiff's

9  violation of Defendant's policies and employee handbook for failing to report his injury in

10  a timely manner and for seeking medical treatment without notifying management

11  ("June 2 Meeting").  Def.'s Mot. at 8; Ex. A, Cotterman Dep., ECF No. 17-6, at 15–16.

12  Plaintiff was provided a written warning in an Employee Corrective Action form for not

13  abiding with Defendant's accident reporting policies, which stated that "[a]dditional

14  deviations from policy or procedure may result in termination."  Ex. E, ECF No. 17-6, at

15  53–54.  Although he was given an opportunity to contest the written warning, Plaintiff

16  signed the form.  Id. ("It has been reported by your own statement, that you had

17  knowledge of the reporting procedures but opted not to follow them."); Pl.'s Response

18  Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 24.  Regardless, Plaintiff

19  continues to assert that he abided the Reporting Policy by notifying Jones.  Id.  The

20  parties dispute as to what next transpired at the meeting.

21        **1.    Defendant's Version of Events**

22        Aside from discussing Plaintiff's failure to report his injury, Defendant states that

23  the other main purpose of the June 2 Meeting was for Defendant to engage with Plaintiff

24  in a timely, good faith interactive process as required by Defendant's RA Policy.  Def.'s

25  Mot. at 9.  Plaintiff provided the Doctor's First Report, which stated that Plaintiff required

26  further treatment, namely, to follow up with his primary care provider.  Ex. B, ECF

27  No. 17-6, at 43.  Based on that report, Plaintiff's current physical complaints, and his

28  stated need for additional medical treatment, Defendant claims it provided Plaintiff with a

1  reasonable accommodation by granting him time off work and paying for Plaintiff's flight

2  home to Pennsylvania so he could obtain treatment with his primary care provider there.

3  Def.'s Mot. at 9 (citing Ex. I, Hammond Dep., ECF No. 17-6, at 138).  Defendant denies

4  informing Plaintiff that he was terminated during the course of this meeting.  See Ex. E,

5  ECF No. 17-6, at 53–54 (Employee Corrective Action form) (showing that none of the

6  termination boxes were marked and stating that Defendant was "removing [Plaintiff] from

7  duty until [he] ha[s] been evaluated by [his] personal care provider as directed by the

8  treating physician/PA."); Ex. I, Hammond Dep., ECF No. 17-6, at 139–40 (stating that he

9  never told Plaintiff he was terminated or laid off during the June 2 Meeting).

10                    **2.    Plaintiff's Version of Events**

11        In addition to the written warning, Plaintiff alleges that Defendant informed him

12  that it was denying Plaintiff's worker's compensation claim and sending Plaintiff home to

13  Pennsylvania.  Cotterman Decl., ECF No. 19-1 ¶¶ 22–23.  Ultimately, Plaintiff says that

14  the main purpose of the meeting was to terminate his employment.  Pl.'s Response

15  Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 24.  Plaintiff does not dispute that

16  Summers and Hammond did not verbally or explicitly state that he was terminated, or

17  that they did not provide him with a formal termination notice, but nonetheless Plaintiff

18  contends that termination is the only reasonable interpretation of Summers and

19  Hammond's words and conduct.  See Ex. A, Cotterman Dep., ECF No. 17-6, at 23

20  (stating that Plaintiff did not think he would be allowed to return to work, but no one said

21  anything verbally); Ex. A, Cotterman Dep., ECF No. 19-6, at 36–38; Pl.'s Response

22  Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 34.  In the past, Defendant hired

23  Plaintiff on a job-by-job basis and Plaintiff was laid off after a job was completed; when

24  Defendant needed Plaintiff for a new assignment, it would rehire him.  Cotterman Decl.,

25  ECF No. 19-1 ¶ 8; Ex. A, Cotterman Dep., ECF No. 19-6, at 5–8.  Thus, removing

26  Plaintiff from the job in question and flying him back home to Pennsylvania was in effect

27  a termination and would have been understood as such by Summers and Hammond.

28  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 29.

1     Plaintiff asked not to be sent home, showed Summers and Hammond the

2   Doctor's First Report which did not impose any work restrictions aside from pain

3   tolerance, and told them that he could continue to work so long as he was taking pain

4   medication and Jones helped him temporarily with more strenuous tasks such as lifting

5   the camera.  Cotterman Decl., ECF No. 19-1 ¶¶ 24, 29.  Summers and Hammond

6   allegedly ignored Plaintiff's requests, did not inquire as to whether Plaintiff could do his

7   job, and did not offer or discuss any other reasonable accommodation.  See Ex. A,

8   Cotterman Dep., ECF No. 19-6, at 24–26.  Instead of sending Plaintiff to see his primary

9   care provider in Pennsylvania, Summers and Hammond gave Plaintiff the business card

10   of a physician's assistant in Pennsylvania who worked with Defendant and its workers'

11   compensation carrier, WorkPlace Health.  Cotterman Decl., ECF No. 19-1 ¶ 26; Ex. A,

12   Cotterman Dep., ECF No. 19-6, at 25.  Hammond told Plaintiff to "go home, get better

13   and then call them back and maybe they'll bring [Plaintiff] back."  Ex. A, Cotterman Dep.,

14   ECF No. 19-6, at 24.

15         **E.     Subsequent Events**

16         Plaintiff returned to Pennsylvania and Defendant claims it continued the ongoing

17   interactive process through its medical management provider AllOne Health ("AllOne") to

18   determine if Defendant could accommodate Plaintiff's restrictions.  Gross Decl., ECF

19   No. 17-3 ¶ 10.  On June 15, 2017, Plaintiff visited the physician's assistant referred by

20   Summers and Hammond.  See Ex. C, ECF No. 17-6, at 45 (email from worker's

21   compensation claim representative); Ex. 7, ECF No. 19-6, at 156–58 (report completed

22   by physician's assistant).  That same day, the nurse case manager from AllOne emailed,

23   among others, Hammond and the worker's compensation claim representative, stating

24   that Plaintiff attended his medical appointment and that the medical provider ordered

25   magnetic resonance imaging ("MRI") of Plaintiff's right shoulder to rule out rotator cuff

26   tear and changed Plaintiff's pain medication.  Ex. C, ECF No. 17-6, at 45 (email from

27   worker's compensation claim representative).  Shortly thereafter, the worker's

28   compensation claim representative responded to AllOne's nurse case manager and

1   stated that Plaintiff's duties would be modified to "no lifting pushing or pulling over

2   10lbs," "no overhead work," and "no repetitive reaching."  Id.  Plaintiff returned for a

3   follow-up visit on June 23, 2017, to review the results of the MRI, and the report

4   completed by the physician's assistant also provided that Plaintiff's current restrictions

5   were modified to no lifting, pushing, or pulling over ten pounds; no overhead work; and

6   no repetitive reaching.  Ex. 7, ECF No. 19-6, at 158 (report completed by physician's

7   assistant); Ex. 8, ECF No. 19-6, at 161–62 (emails from AllOne's nurse case manager).

8          Plaintiff agrees that these work restrictions were imposed but alleges the

9   physician's assistant imposed them on Plaintiff prior to seeing the results of his MRI and

10  in direct contradiction of the Doctor's First Report.  Ex. A, Cotterman Dep., ECF No. 19-

11  6, at 29–31.  Furthermore, both the physician's assistant and nurse case manager noted

12  in their reports and correspondence that Plaintiff said "he was let go" by Defendant, but

13  Plaintiff states that Defendant never made any attempt to correct him.  Ex. 7, ECF

14  No. 19-6, at 156 (report completed by physician's assistant); Ex. 8, ECF No. 19-6, at 163

15  (email from AllOne's nurse case manager); but see Hammond Dep., ECF No. 17-6, at

16  140 (stating that it was not true that Plaintiff had been let go by Defendant despite

17  Plaintiff's statements and thus "nothing was followed up on.").

18         Defendant, reiterating that it did not terminate Plaintiff's employment, claims that

19  after receiving and considering Plaintiff's recently imposed work restrictions, Defendant

20  determined that it could not accommodate those restrictions in his current position as a

21  Level I Technician:

22             Accordingly, Plaintiff being able to carry, set up, and
              manipulate the x-ray camera, which weighed approximately 55
23             pounds, was an essential job function of his Level I Technician
              position, and could not be eliminated and/or simply handled by
24             the Level II Technician because the Level II Technician has
              other job duties.  To require the Level II Technician to move
25             and set up the x-ray camera would turn a two man job into a
              one man job.  Thus, this was not a reasonable accommodation
26             that Defendant could provide.

27             Defendant also determined that it had no alternative work
              available for Plaintiff.  Defendant could not reassign Plaintiff to
28             perform administrative work because Defendant does not

1
2
3
4

> have any administrative offices in California or Pennsylvania (where Plaintiff resides).  Additionally, there were no available light duty positions, as all of Defendant's California and Pennsylvania employees are considered field workers, either Level I or Level II Technicians.  Additionally, based on his qualifications, certifications, and experience, Plaintiff was not qualified to be a Level II Technician.

5
6
7
8

> The reasonable accommodation that Defendant did provide Plaintiff was time off work, beginning on June 2, 2017 when it agreed to fly him home so he could receive follow up medical treatment with his primary care physician, as well as additional time off while he recovered from his injury and subsequent treatment.

9   Gross Decl., ECF No. 17-3 ¶¶ 12–14; see also Ex. D, ECF No. 17-6, at 49 (Level I

10  Technician job description).

11      Plaintiff's injury ultimately proved to be more serious and on November 20, 2017,

12  Plaintiff had shoulder surgery.  Pl.'s Response Def.'s Statement of Undisputed Facts,

13  ECF No. 19-4 ¶ 51; see Ex. H, ECF No. 17-6, at 126 (medical report).  As a result,

14  Plaintiff was unable to work for one year, or until November 2018, while recovering from

15  the surgery.  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 19-4 ¶ 52

16  (citing Ex. A, Cotterman Dep., ECF No. 17-6, at 33).  Although Plaintiff says he would

17  have been able to work as a Level I Technician without any accommodations between

18  November 2018 and November 2019, Plaintiff did not reach out to Defendant or his

19  union about continuing his employment, believing that his employment had already been

20  terminated by Defendant.  Id. ¶¶ 53–54.

21      As a union employee with a variable, project-based work schedule, Plaintiff was

22  responsible for notifying his union when he was ready or able to work.  Id. ¶ 55.  At the

23  time, Defendant had a policy that union employees who had not been assigned to a job

24  for 180 days were considered inactive but were eligible to perform assignments without

25  having to go through the new hire process again for up to one year.  Id. ¶¶ 56–57.

26  According to Defendant, it placed Plaintiff on layoff status after 180 days of inactivity but

27  did not terminate his employment.  Id. ¶ 56.  After a year of inactivity and Plaintiff's

28  failure to follow-up with Defendant regarding his status, Defendant claims that, this time,

1   Plaintiff's employment was terminated in June 2018.  Id. ¶ 58.  While Plaintiff does not

2   dispute these facts, he continues to assert that he was already terminated by then so

3   such facts are irrelevant.  See Pl.'s Response Def.'s Statement of Undisputed Facts,

4   ECF No. 19-4 ¶¶ 52–59.

5

6                                         **STANDARD**

7

8          The Federal Rules of Civil Procedure provide for summary judgment when "the

9   movant shows that there is no genuine dispute as to any material fact and the movant is

10  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

11  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

12  dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

13         Rule 56 also allows a court to grant summary judgment on part of a claim or

14  defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

15  move for summary judgment, identifying each claim or defense—or the part of each

16  claim or defense—on which summary judgment is sought.");  see also Allstate Ins. Co. v.

17  Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a

18  motion for partial summary judgment is the same as that which applies to a motion for

19  summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

20  Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

21  judgment standard to motion for summary adjudication).

22         In a summary judgment motion, the moving party always bears the initial

23  responsibility of informing the court of the basis for the motion and identifying the

24  portions in the record "which it believes demonstrate the absence of a genuine issue of

25  material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

26  responsibility, the burden then shifts to the opposing party to establish that a genuine

27  issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v.

28  ///

                                              12

1    Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co.,

2    391 U.S. 253, 288–89 (1968).

3              In attempting to establish the existence or non-existence of a genuine factual

4    dispute, the party must support its assertion by "citing to particular parts of materials in

5    the record, including depositions, documents, electronically stored information,

6    affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

7    not establish the absence or presence of a genuine dispute, or that an adverse party

8    cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

9    opposing party must demonstrate that the fact in contention is material, i.e., a fact that

10   might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

11   Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

12   Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also

13   demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

14   such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

15   477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

16   before the evidence is left to the jury of "not whether there is literally no evidence, but

17   whether there is any upon which a jury could properly proceed to find a verdict for the

18   party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

19   (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

20   As the Supreme Court explained, "[w]hen the moving party has carried its burden under

21   Rule [56(a)], its opponent must do more than simply show that there is some

22   metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,

23   "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

24   non-moving party, there is no 'genuine issue for trial.'"  Id. at 587.

25             In resolving a summary judgment motion, the evidence of the opposing party is to

26   be believed, and all reasonable inferences that may be drawn from the facts placed

27   before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S.

28   at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing

13

1  party's obligation to produce a factual predicate from which the inference may be drawn.

2  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

3  810 F.2d 898 (9th Cir. 1987).

4

5  **ANALYSIS**[6]

6

7        Defendant moves for summary judgment on all of Plaintiff's causes of action in

8  the following order:  (1) failure to provide reasonable accommodations; (2) failure to

9  engage in a good faith interactive process; (3) disability discrimination in violation of

10  California's Fair Employment and Housing Act ("FEHA"); (4) retaliation in violation of

11  FEHA; (5) failure to prevent discrimination and retaliation; (6) declaratory judgment; (7)

12  denial of and discrimination based upon the use of sick leave; and (8) wrongful

13  termination.  The Court will address each cause of action in that order as well.

14      **A.**    **Fourth Cause of Action:  Failure to Provide Reasonable**
              **Accommodations in Violation of FEHA**

15

16        A failure to reasonably accommodate an employee who has a known physical or

17  mental disability is an unlawful employment practice violative of FEHA.  Cal. Gov't Code

18  § 12940(m); A.M. v. Albertsons, LLC, 178 Cal. App. 4th 455, 463–64 (2009).  "A

19  reasonable accommodation is 'a modification or adjustment to the workplace that

20  enables the employee to perform the essential functions of the job held or desired.'"

21  Lui v. City and Cnty. of S.F., 211 Cal. App. 4th 962, 971 (2012) (quoting Nadaf-Rahrov v.

22  Neiman Marcus Grp., Inc., 166 Cal. App. 4th 952, 974 (2008)); see also Cal. Gov't Code

23  § 12926(p) (listing examples of reasonable accommodations to include "[j]ob

24        [6] Plaintiff's opposition was due on April 29, 2021, but the opposition was not filed until April 30 at

25  8:39 a.m.  The Court recognizes Defendant's request that Plaintiff's opposition be stricken because it was filed late.  Def.'s Reply at 4–5.  Because Plaintiff's opposition was filed together with two declarations from

26  counsel and a paralegal explaining that the opposition, while timely prepared, was filed late due to technical issues, the Court believes that good cause has been shown under Federal Rule of Civil Procedure 6(b) to permit the late filing.  See ECF No. 20.  While Defendant also claims that Plaintiff did not

27  serve Defendant with his opposing papers until April 30 at 12:48 a.m., counsel for Defendant does not allege that it was precluded from filing an adequate reply.  Defendant's request to strike Plaintiff's

28  opposition is therefore DENIED.

1    restructuring, part-time or modified work schedules, reassignment to a vacant position,

2    acquisition or modification of equipment or devices, adjustment or modifications of

3    examinations, training materials or policies, the provision of qualified readers or

4    interpreters, and other similar accommodations for individuals with disabilities.").  "An

5    employer, however, is not required to provide 'an accommodation that is demonstrated

6    by the employer . . . to produce undue hardship to its operation.'"  Dep't of Fair Emp. and

7    Hous. v. Lucent Tech., Inc., 642 F.3d 728, 743 (9th Cir. 2011) (quoting Cal. Gov't Code

8    § 12940(m)).

9          The essential elements of a failure to accommodate claim are:
           (1) the plaintiff has a disability covered by the FEHA; (2) the
10          plaintiff is a qualified individual (i.e., he or she can perform the
           essential functions of the position); and (3) the employer failed
11          to reasonably accommodate the plaintiff's disability.

12    Cuiellette v. City of L.A., 194 Cal. App. 4th 757, 766 (2011); Taylor v. Trees, Inc.,

13    58 F. Supp. 3d 1092, 1111 (E.D. Cal. 2014).  Here, Defendant claims that Plaintiff

14    cannot establish the second or third prongs.[7]

15          Defendant first claims that Plaintiff could not have performed the essential

16    functions of the Level I Technician position, specifically carrying and lifting the 55-pound

17    camera.  Def.'s Mot. at 13.  In support, Defendant relies on the medical restrictions

18    imposed after Plaintiff's visit with the physician's assistant in Pennsylvania on June 15,

19    2017, arguing "that following the incident and up until his surgery in November 2017,

20    Plaintiff[] had medical restrictions of no lifting or pulling over 10 pounds, no overhead

21    work, and no repetitive reaching."  Id.; see Ex. C, ECF No. 17-6, at 45.  However, those

22    medical restrictions were not imposed until after the June 2 Meeting when Defendant

23    already decided to put Plaintiff on leave to return to Pennsylvania for a follow-up visit

24    with his primary care provider.  See Ex. C, ECF No. 17-6, at 45 (email from worker's

25    compensation claim representative); Ex. 7, ECF No. 19-6, at 156–58 (report completed

26

27          [7] Defendant argues for the first time in its Reply brief that it was not on notice of a qualifying
      disability under FEHA on June 2, 2017.  See Def.'s Reply at 5–7.  "The district court need not consider
28    arguments raised for the first time in a reply brief."  Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007).
      Therefore, the Court will not grant summary judgment for Defendant on that basis.

1    by physician's assistant).  The fact that such restrictions were imposed at a later date is

2    irrelevant as to what Defendant knew at the time it made the decision to first put Plaintiff

3    on leave on June 2, 2017.

4        Plaintiff does not dispute that carrying and lifting the camera is an essential

5    function, but instead claims that he could have performed the other functions and only

6    needed Jones' assistance in lifting the camera.  Pl.'s Opp'n at 12.  Citing to the Doctor's

7    First Report, Plaintiff states that no work restrictions were in place at the June 2 Meeting.

8    Id. at 13; see Ex. 6, ECF No. 19-6, at 153–54.  In fact, the Doctor's First Report provides

9    that Plaintiff hurt his shoulder while lifting and cranking the camera, presumably the

10    same function Defendant claims Plaintiff cannot perform, and yet, the physician's

11    assistant still wrote that Plaintiff could perform his usual work as long as he tolerates the

12    pain.  Id. at 154.  Therefore, a genuine factual dispute arises as to whether Plaintiff could

13    have performed the essential functions of his job with or without accommodation when

14    Defendant decided to put Plaintiff on leave on June 2, 2017.

15        The parties also dispute whether Defendant failed to reasonably accommodate

16    Plaintiff's disability.  According to Defendant, "[t]he reasonable accommodation that

17    Defendant did provide Plaintiff was time off work, beginning on June 2, 2017[,] when it

18    agreed to fly him home so he could receive follow up medical treatment with his primary

19    care physician, as well as additional time off while he recovered from his injury and

20    subsequent treatment."  Pl.'s Response Def.'s Statement of Undisputed Facts, ECF

21    No. 19-4 ¶ 50 (emphasis added); see also Def.'s Mot. at 9, 11.  "[A] finite leave [of

22    absence] can be a reasonable accommodation under FEHA, provided it is likely that at

23    the end of the leave, the employee would be able to perform his or her duties."  Hanson

24    v. Lucky Stores, Inc., 74 Cal. App. 4th 215, 226 (1999); see Cal. Code Regs. tit. 2,

25    § 11068(c).  However, "[w]hen an employee can work with a reasonable accommodation

26    other than a leave of absence, an employer may not require that the employee take a

27    leave of absence."  Cal. Code Regs. tit. 2, § 11068(c); see also Wallace v. Cnty. of

28    Stanislaus, 245 Cal. App. 4th 109, 134 (2016).

1        As discussed above, there is a triable issue of fact as to whether Plaintiff could

2   have performed the essential functions of his job with or without accommodation on

3   June 2, 2017.  Defendant contends that it was abiding by the Doctor's First Report "by

4   flying him home so that he could follow up with his primary care provider."  Def.'s Mot. at

5   14.  However, in assessing what accommodations are appropriate, an employer cannot

6   simply point to medical reports that have been generated to escape liability under FEHA;

7   it "cannot slavishly defer to a physician's opinion without first pausing to assess the

8   objective reasonableness of the physician's conclusions."  Gelfo v. Lockheed Martin

9   Corp., 140 Cal. App. 4th 34, 50 n.11 (2006).  Defendant relied solely on the statement in

10  the Doctor's First Report that Plaintiff needed to follow-up with his primary care provider

11  and seemingly ignored the other statement that Plaintiff could perform his usual tasks as

12  long as he tolerates pain.  Furthermore, even accepting Defendant's argument that

13  further evaluation was needed and thus it was a reasonable accommodation to grant

14  Plaintiff leave on June 2, 2017, to return to Pennsylvania to see his primary care

15  provider, it is undisputed that Plaintiff was not sent home to see his primary care provider

16  but instead the physician's assistant referred by Summers and Hammond.[8]  See Ex. C,

17  ECF No. 17-6, at 45; Ex. 7, ECF No. 19-6, at 156–58.

18       In sum, making all inferences in favor of Plaintiff, the Court finds that there are

19  triable issues of fact as to whether Plaintiff could have performed the essential functions

20  of his position and whether Defendant reasonably accommodated Plaintiff's disability on

21  June 2, 2017.  Accordingly, Defendant's Motion for Summary Judgment as to this cause

22  of action is DENIED.

23  ///

24  ///

25         [8] Defendant further claims that there was no vacant, light duty position for Plaintiff, and that
Plaintiff was not qualified to be promoted to a Level II Technician.  See Def.'s Mot. at 14.  However, such

26  alternatives were not considered until after June 15, 2017, when the modified restrictions were imposed.
See Gross Decl., ECF No. 17-3 ¶¶ 10–14.  As a result, Plaintiff's ex parte Objection to and Motion to Strike

27  Evidence Introduced on Reply is DENIED as moot.  ECF No. 22 (seeking to strike the Supplemental
Declaration of Stacy Gross and its accompanying exhibits submitted in support of Defendant's argument

28  that Plaintiff was not qualified to be promoted to a Level II Technician).

1

2

**B.      Fifth Cause of Action:  Failure to Engage in Good Faith Interactive Process in Violation of FEHA**

3      Defendant states that "[t]he other main purpose of the June 2, 2017[,] meeting

4 was so that Defendant could engage Plaintiff in a timely, good faith interactive process

5 based on Plaintiff's reported symptoms."[9]  Def.'s Mot. at 9, 16 (stating that Defendant, in

6 part, "engaged in the good faith interactive process by flying Plaintiff home so that he

7 could follow up with his primary care provider, as the [Doctor's First Report] presented to

8 Defendant recommended.") (citing Ex. F, ECF No. 17-6, at 61–62 (RA Policy)).  Under

9 California law, an employer must engage in a "timely, good faith, interactive process . . .

10 in response to a request for reasonable accommodation by an employee or applicant

11 with a known physical or mental disability or known medical condition."  Cal. Gov't Code

12 § 12940(n).  A failure to so engage constitutes an unlawful employment practice under

13 FEHA, and independent of liability for other FEHA claims.  Wysinger v. Automobile Club

14 of So. Cal., 157 Cal. App. 4th 413, 424 (2007).  Triggering an employer's obligation to

15 engage in this regard requires no special request; it simply arises once the employer

16 becomes aware of the need to consider an accommodation.  Scotch v. Art Institute of

17 Cal., 173 Cal. App. 4th 986, 1013 (2009); Cal. Code Regs. tit. 2, § 11069(b).  The

18 employer must accordingly explore various accommodations even in the absence of a

19 specific request from the employee.  See Nadaf-Rahrov, 166 Cal. App. 4th at 984 ("The

20 interactive process requires communication and good-faith exploration of possible

21 accommodations between employers and individual employees with the goal of

22 identifying an accommodation that allows the employee to perform the job effectively.")

23 (internal quotation marks and alterations omitted).  Moreover, "for the process to work

24 ///

25 _____

26      [9] Once again, Defendant argues for the first time in its Reply brief that, because Defendant had insufficient information to put it on notice that Plaintiff had a qualifying disability, the duty to engage in a timely, good faith interactive process was not triggered at the June 2 Meeting.  See Def.'s Reply at 13–14.

27 As previously stated, the Court will not grant summary judgment on such a basis, especially here where Defendant explicitly stated in its Motion that it engaged in a good faith interactive process with Plaintiff on

28 June 2, 2017.

1   '[b]oth sides must communicate directly, exchange essential information and neither side
2   can delay or obstruct the process.'"  Id. at 984–85.

3       As stated above, there are triable issues of fact as to whether Plaintiff could have
4   performed the essential functions of his position with or without accommodation, as well
5   as whether Defendant failed to reasonably accommodate Plaintiff on June 2, 2017.  For
6   example, the Doctor's First Report, which was presented to Summers and Hammond at
7   the June 2 Meeting, states that Plaintiff could have continued working so long as he
8   tolerated the pain.  A jury could reasonably infer that, as of June 2, 2017, alternative
9   accommodations besides putting Plaintiff on leave should have been considered, such
10  as Plaintiff's suggestion that Jones assist him in lifting the camera.  See Ex. 1,
11  Cotterman Dep., ECF No. 19-6, at 32; Cotterman Decl., ECF No. 19-1 ¶ 29.

12      Furthermore, during his deposition, Hammond testified that he could not recall if
13  Plaintiff "espouse[d] any kind of opinion about whether he should go see his primary
14  doctor, whether he shouldn't return to work, [or] whether he could return to work[.]"
15  Ex. 2, Hammond Dep., ECF No. 19-6, at 52–54.  Similarly, Plaintiff testified that, at the
16  June 2 Meeting, there was no discussion as to what Plaintiff could or could not do with
17  his injury despite Plaintiff presenting Summers and Hammond with the Doctor's First
18  Report that said he could work.  Ex. 1, Cotterman Dep., ECF No. 19-6, at 24; see also
19  Cotterman Decl., ECF No. 19-1 ¶ 24 (stating that Summers and Hammond ignored
20  Plaintiff's request to not be sent home).  Accordingly, the Court finds triable issues of fact
21  as to whether Defendant engaged in a good faith interactive process and thus, summary
22  judgment as to this cause of action is DENIED.

23      **C.**    **First, Second, Third, and Sixth Causes of Action:  Disability
            Discrimination, Retaliation, and Failure to Prevent Discrimination and
24          Retaliation in Violation of FEHA and Declaratory Judgment**

25      The FEHA prohibits discriminatory discharge stemming from an employee's
26  actual disability, or the employer's perception that he or she is disabled, if the employee
27  can otherwise perform with reasonable accommodations.  Cal. Gov't Code § 12940.
28  Under subdivision (a) of the statute, it is unlawful employment practice to discharge an

1  employee based on a disability.  FEHA also explicitly declares its legislative intent as

2  providing "protection when an individual is erroneously or mistakenly believed to have

3  any physical . . . condition . . ." even if he or she actually does not.  Id. § 12926.1.

4        A three-step burden shifting framework, first enunciated by the United States

5  Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is generally

6  used to assess discrimination claims in the absence of direct evidence of discrimination.

7  Scotch, 173 Cal. App. 4th at 1004–05.  Under the so-called McDonnell Douglas test, a

8  plaintiff must make a prima facie case of discrimination by producing evidence that he or

9  she (1) was either disabled or perceived to be disabled; (2) was qualified for the position

10  with the requisite skills to perform its essential functions with or without

11  accommodations; (3) suffered an adverse employment action like discharge that was

12  (4) substantially motivated by the plaintiff's disability or perceived disability.  Id. (citing

13  Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 355 (2000); see also Nadaf-Rahrov, 166

14  Cal. App. 4th at 962).  If the required prima facie showing is made, a presumption of

15  discrimination arises and the burden shifts to the employer to rebut that presumption with

16  evidence of a legitimate, non-discriminatory reason for its adverse action against the

17  employee.  Scotch, 173 Cal. App. 4th at 1004–05.  Finally, if that burden is met, the

18  employee must then offer evidence that the reasons proffered by the employer to justify

19  its decisions were mere pretexts.  Id.

20        Similarly, FEHA prohibits any retaliation against an employee in response to a

21  request for accommodation.  Cal. Gov't Code § 12940(m)(2).  To establish retaliation

22  under FEHA, the employee must show that he was engaged in protected activity, and

23  that he was subsequently subjected to an adverse employment action that was

24  substantially motivated by that activity.  Moore v. Regents of the Univ. of Cal.,

25  248 Cal. App. 4th 216, 244 (2016).  The McDonnell Douglas burden shifting analysis

26  applies.  Id. at 248.  In addition, close temporal proximity between an employee's

27  protected conduct and an adverse employment action may support an inference that the

28  ///

1   action was retaliatory.  Rope v. Auto-Chlor Sys. of Wash., 220 Cal. App. 4th 635, 653
2   (2013) (abrogated by statute on other grounds).

3        Here, Defendant claims that "Plaintiff cannot establish a triable issue that
4   Defendant subjected him to an adverse employment action for requesting reasonable
5   accommodation" because Defendant did not terminate Plaintiff at the June 2 Meeting.[10]
6   Def.'s Mot. at 17–18.  It is undisputed that Plaintiff "was not explicitly told he was
7   terminated, and was not given a formal termination notice."  Pl.'s Opp'n at 20; see Ex. E,
8   ECF No. 17-6, at 53–54 (showing that none of the termination boxes were marked and
9   stating that "[f]urther violations may result in further disciplinary action, up to and
10  including termination."); Ex. I, Hammond, Dep., ECF No. 17-6, at 139–40 (stating that he
11  never explicitly told Plaintiff he was terminated or laid off during the June 2 Meeting).
12  Nevertheless, Plaintiff argues that "it was clear to Plaintiff based on Defendant's conduct
13  that it had terminated him."  Pl.'s Opp'n at 20–21 ("To Plaintiff, this clearly constituted a
14  termination because Plaintiff was being separated from the job he was specifically and
15  solely hired to perform, and flown thousands of miles away.").

16       For example, Plaintiff claims that the nature of his employment with Defendant,
17  i.e., having to be hired on a job-by-job basis and being laid off at the end of each job,
18  supports the conclusion that Defendant sending Plaintiff back to Pennsylvania was in
19  effect a termination.  Id. at 20–21.  Additionally, Plaintiff testified at his deposition that
20  Summers and Hammond told him at the June 2 Meeting to "go home, get better and
21  then call them and maybe they'll bring [him] back."  Ex. A, Cotterman Dep., ECF No. 17-
22  6, at 24 (emphasis added); see Pl.'s Opp'n at 21 ("Instead, there is a reasonable – and
23  triable – inference that Hammond deliberately gave reason to doubt he would ever be
24  allowed to return to work with Defendant, because Defendant did not want Plaintiff to
25  return to work.").  However, even considering Plaintiff's arguments, they raise nothing

26       [10] Regarding the disability discrimination cause of action, Defendant argues that Plaintiff cannot
27  establish the second element, i.e, that he is a qualified individual, and relies on arguments it previously
    made with regard to Plaintiff's failure to reasonably accommodate claim.  Def.'s Mot. at 17.  As explained
28  above, however, there is a triable issue of fact as to whether Plaintiff could have performed the essential
    functions of his job on June 2, 2017, with or without accommodation.

1   more than speculation that he was terminated especially in light of the Employee

2   Corrective Action form issued at the June 2 Meeting which does not state Plaintiff was

3   terminated but instead provides that Plaintiff was issued a written warning for not abiding

4   by the Reporting Policy and that he was being removed from duty "until [he has] been

5   evaluated by [his] personal care provider as directed by the treating

6   physician/[physician's assistant]."[11]  See Ex. E, ECF No. 17-6, at 53–54.

7          Alternatively, in the event the Court finds that there was no actual termination,

8   Plaintiff claims that the same facts suggest there was constructive termination.  Pl.'s

9   Opp'n at 22 n.3.  In order to prove a constructive discharge, Plaintiff must show that

10  Defendant "either intentionally created or knowingly permitted working conditions that

11  were so intolerable or aggravated at the time of the employee's resignation that a

12  reasonable employer would realize that a reasonable person in the employee's position

13  would be compelled to resign."  Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1251

14  (1994).  However, Plaintiff has not made any specific allegations or presented any

15  evidence to such an effect.

16         Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's disability

17  discrimination and retaliation causes of action is GRANTED.  Furthermore, because

18  Plaintiff's causes of action for failure to prevent discrimination and retaliation and

19  declaratory relief are derivative of the discrimination and retaliation claims, summary

20  judgment is also GRANTED as to those causes of action.  See Glynn v. Superior Ct.,

21  42 Cal. App. 5th 47, 56 (2019).

22  ///

23  ///

24  ///

25  _____

26  [11] Plaintiff points to notes made by the physician's assistant in Pennsylvania and AllOne's nurse case manager stating that Plaintiff claimed he was let go as further evidence that Defendant terminated Plaintiff.  See Ex. 7, ECF No. 19-6 (report completed by physician's assistant); Ex. 8, ECF No. 19-6, at 163

27  (email from nurse case manager).  In addition to being inadmissible hearsay, see Fed. R. Evid. 801, such statements still only evince Plaintiff's subjective belief and is insufficient to raise a triable issue of fact as to

28  whether Plaintiff was actually terminated.

22

1
2

**D.      Seventh Cause of Acton:  Denial of and Discrimination Based Upon the Use of Sick Leave in Violation of California Labor Code §§ 233, 234, and 246.5**

3      California Labor Code § 233 states that "[a]ny employer who provides sick leave

4   for employees shall permit an employee to use in any calendar year the employee's

5   accrued and available sick leave entitlement, in an amount not less than the sick leave

6   that would be accrued during six months at the employee's then current rate of

7   entitlement, for the reasons specified in subdivision (a) of Section 246.5."  See also Cal.

8   Lab. Code § 234 ("An employer absence control policy that counts sick leave taken

9   pursuant to Section 233 as an absence that may lead to or result in discipline, discharge,

10   demotion, or suspension is a per se violation of Section 233.").  Under California Labor

11   Code § 246.5(a)(1), "[u]pon the oral or written request of an employee, an employer shall

12   provide paid sick days for . . . [d]iagnosis, care, or treatment of an existing health

13   condition of, or preventative care for, an employee or an employee's family member."

14      In his Complaint, Plaintiff alleges that he "used and attempted to use accrued sick

15   leave to seek treatment for a medical condition" but "[i]n response, Defendant[]

16   threatened Plaintiff with termination, disciplined Plaintiff and ultimately terminated

17   Plaintiff."  Compl. ¶ 88; see also Pl.'s Opp'n at 24 (contending that Defendant "fail[ed] to

18   permit [Plaintiff] to use his accrued and available sick leave to diagnose, care for, and

19   treat his health condition in Sacramento, California, on or prior to June 2, 2018"[12] and

20   instead terminated Plaintiff at the June 2 Meeting).  As outlined above, there is no triable

21   issue of fact based on the present record that Plaintiff was terminated on June 2, 2017,

22   let alone that his termination was based on any use of sick leave.  See Def.'s Reply at

23   15–16.  Therefore, summary judgment is GRANTED as to this cause of action.

24   ///

25   ///

26   ///

27

28      _____

[12] Given that Plaintiff reiterates he was terminated at the June 2 Meeting, the Court assumes that Plaintiff intended to say 2017, not 2018.

1

2

**E.     Eighth Cause of Action:  Wrongful Termination in Violation of Public Policy**

3

4

5

6

7

8

9

Wrongful termination requires a showing of the following elements:  (1) an employer-employee relationship; (2) termination or other adverse employment action; (3) a violation of public policy; (4) causation; and (5) damages.  <u>See</u>, <u>e.g.</u>, <u>Holmes v. Gen. Dynamics Corp.</u>, 17 Cal. App. 4th 1418, 1426 (1993).  This cause of action is derivative of Plaintiff's disability discrimination and retaliation causes of action and because the evidence before the Court on summary judgment does not show that Plaintiff was terminated, summary judgment is GRANTED as to this cause of action.

10

11

**CONCLUSION**

12

13

14

15

16

17

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 17, is GRANTED as to Plaintiff's First, Second, Third, Sixth, Seventh, and Eighth Causes of Action.  The Motion for Summary Judgment is otherwise DENIED as to Plaintiff's Fourth and Fifth Causes of Action.  Plaintiff's ex parte Objection to and Motion to Strike Defendant's Evidence Introduced on Reply, ECF No. 22, is DENIED as moot.

18

IT IS SO ORDERED.

19

Dated:  March 17, 2022

20

21

MORRISON C. ENGLAND, JR.
SENIOR UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28